Jimmy **SINAJINI**, et al., Plaintiffs,

and

**The Navajo Nation and The United States of America, Plaintiffs–Intervenors,**

v.

**BOARD OF EDUCATION OF THE SAN JUAN SCHOOL DISTRICT, et al., Defendants.**

**Utah State Board of Education and State Superintendent of Public Instruction, Amicus Curiæ.**

Civil No. 2:74–CV–346S.

United States District Court,
D. Utah,
Central Division.

Feb. 5, 1999.

Donald J. Winder, Trystan B. Smith, Winder & Haslam, Salt Lake City, UT, Herbert Yazzie, Navajo Nation, Department of Justice, Window Rock, AZ, Therese E. Yanan, DNA–People's Legal Services, Shiprock, NM, Eric P. Swenson, Monticello, UT, for plaintiff.

Kimberly A. Rozak, Navajo Nation, Department of Justice, Window Rock, AZ, Lawrence R. Baca, U.S. Dept. of Justice, Civil Rights Division, Washington, DC, Stephen J. Sorensen, AUSA, U.S. Attor-

ney's Office, District of Utah, Salt Lake City, UT, for intervenor.

Lafayette R. Anderson, Monticello, UT, Daniel G. Anderson, Anderson & Anderson, Monticello, UT, Randy T. Austin, Von G. Keetch, Kirton & McConkie, Salt Lake City, UT, Craig C. Halls, San Juan County Attorney, Monticello, UT, Brinton R. Burbidge, Burbidge Carnahan Ostler & White, Salt Lake City, UT, for defendant.

John S. McAllister, Jennifer L. Falk, Utah Attorney General's Office, Education Division, Salt Lake City, UT, for amicus curiae.

## ORDER

SAM, Chief Judge.

This case came before the court on three related motions. The plaintiffs filed two motions for orders requiring the defendant Board of Education of the San Juan County School District (District) and amicus curiæ the Utah State Board of Education (State Board) to pay plaintiffs' costs and attorney fees pursuant to 42 U.S.C. § 1988(b). The State Board, together with the State Superintendent of Public Instruction, asked the court to consider separately issues of entitlement to fees and reasonableness of the amount requested. In a phone conference with the parties, the court granted the State Board's motion. A hearing on the issue of entitlement was then held on December 15, 1998.

### I. Procedural background

In 1974 the plaintiffs, all Native Americans, filed this lawsuit against the District and its members, the State Board and its members, and the State Superintendent of Public Instruction. They alleged that the defendants violated the United States Constitution and various federal laws by (1) expending more funds for construction and operation of schools within the San Juan School District which served non-Native American students than for those which predominantly served Native American students, and (2) failing to provide a bicultural and bilingual education program to benefit non-English speaking Native American students. (See Memorandum Decision of May 25, 1995 "1995 Decision" at 2.) The case was certified as a class, with the plaintiffs representing all Native American students in the San Juan School District.

In 1975 the parties stipulated to an agreement which this court, Judge Aldon J. Anderson presiding, incorporated into a consent decree. (See file following doc. #4 & Exhibit G to District's memorandum in opposition.)

The final provision of the 1975 Agreement specified, "The parties shall pay their own costs and attorney's fees." *Id.*, ¶ 53.

More than seventeen years later, the plaintiffs filed a Verified Motion in Supplemental Proceedings, and the Navajo Nation intervened as a plaintiff, alleging that the District had not complied with the 1975 Agreement and Consent Decree. Judge Anderson agreed to reopen the case and assert jurisdiction "for the purposes of enforcing this court's Judgment and Decree adopting the terms of the [1975] Agreement." (Memorandum Decision of May 27, 1993.)

Soon thereafter, the plaintiffs filed a Second Verified Motion in Supplemental Proceedings which addressed particular educational needs of Native American teenagers at Navajo Mountain, Utah. Both motions raised claims and allegations which were not contained in the 1975 Agreement and Consent Decree. Because there had never been an adjudication or admission of any constitutional violation in this case, Judge Anderson determined that modification of the Agreement would not be allowed absent "a clear showing of extraordinary circumstances," which plaintiffs had not made. (Order Denying Plaintiffs' Motion to Modify of November 30, 1993 at 7; quoting ¶ 47 of Agreement.) Accordingly, those paragraphs which raised claims and allegations beyond the scope of the Agreement and Consent Decree, were stricken from the plaintiffs' motions.

The plaintiffs filed a Third and Fourth Verified Motions in Supplemental Proceedings, and the United States filed a Complaint–in–Intervention. The case was reassigned to Judge David K. Winder.

Agreeing with Judge Anderson's reasoning, Judge Winder refused to consider "any allegations which raise claims or request remedies not contained in either the Agreement or the court's 1975 Decree." 1995 Decision at 6. Accordingly, Judge Winder granted the District's motions to strike various paragraphs in the plaintiffs' Third and Fourth Verified Motions and in the United States' Complaint–in–Intervention. *Id.* at 5–11.

The plaintiffs commenced two new cases against the District, both alleging discriminatory practices against Native American students. *Meyers v. Board of Education of the San Juan School District,* 905 F.Supp. 1544 (D.Utah 1995), and *Chee v. Board of Education of the San Juan School District,* No. 2:94–CV–0386. In *Meyers,* the plaintiffs reasserted the new claims they had tried to raise in their Second Verified Motion in Supplemental Proceedings in this case. *See* 1995 Decision at 3 n. 2. Judge Winder observed that the plaintiffs could also pursue allegations stricken from their Third Verified Motion by filing a new case or amending their complaint in *Meyers* or *Chee. Id.* at 8.[1]

Judge Winder distinguished this case from original civil rights actions. *Id.* at 10. He wrote:

> [B]ecause *this is an enforcement proceeding and not an original civil rights*

*action,* the better approach is to limit the United States to arguing about whether the District has or has not complied with its obligations under the "clear and specific" terms of the Agreement and the court's 1975 Decree.

> ... *[T]his case is and always has been about whether the District is complying with the terms of the Agreement and the court's 1975 Decree.*

*Id.* at 10–11 (emphasis added).

The Fourth Verified Motion alleged for the first time that the State Board had also violated the Agreement and Consent Decree. *Id.* at 4 n. 4. The plaintiffs later filed a Fifth Verified Motion, also directed at the State Board. Judge Winder denied both the Fourth and Fifth Verified Motions on the merits. (*See* Minute Entry of October 31, 1996.)

The *Sinajini* case then languished while the plaintiffs pursued their claims in *Meyers.* On November 22, 1996, the parties reached a settlement in *Meyers.* (*See* Exhibit G to plaintiffs' reply memorandum in response to amicus curiae.) Later they stipulated to a significant award of costs and attorney fees for the plaintiffs' work in that case. (*See* file doc. # 321 in *Meyers.*)[2]

Returning to *Sinajini,* the plaintiffs filed a Sixth Verified Motion for Supplemental Proceedings and moved for partial summary judgment on their claims that the District had violated paragraphs 19, 31 & 46 of the 1975 Agreement. Their motion for partial summary judgment was denied. (Order of April 24, 1997.)

---

1. The plaintiffs had sought to consolidate *Meyers* with *Sinajini,* but Judge Anderson found that the cases involved different issues and were at disparate stages in the litigation process. (Order of December 28, 1993.) Similarly, when the plaintiffs sought to consolidate *Chee* with *Sinajini,* Judge Winder denied the request, explaining:

 > *Chee* is a newly filed civil rights case which ... focuses on the District's alleged racial discrimination in its special education programs.... This case, by contrast, is a twenty-year old enforcement proceeding the focus of which is whether the District has

 complied with the express terms of the Agreement and the court's 1975 Decree. ... The court therefore sees no reason to delay resolution of the Plaintiffs' enforcement motions in this case while it waits for the *Chee* litigation to wind its way through the system.

 1995 Decision at 13. Judge Winder suggested it might be more appropriate to consolidate *Chee* with *Meyers. Id.* at 14.

2. Plaintiffs ask the court to take judicial notice of the record in *Meyers.* (Reply memorandum in support of second motion for fees at 2 n. 1.)

In 1997 the parties reached a new agreement which was incorporated into a new consent decree.[3] The 1997 Agreement explicitly "superseded, dissolved and replaced" the 1975 Agreement. (Paragraph 9.) Its stated purpose was:

> to resolve the dispute concerning compliance with the 1975 Agreement and related issues, including paragraphs 11–16 of the United States' Complaint–in–Intervention . . ., the issues raised in the referral dated February 10, 1994 from the Office for Civil Rights . . . to the United States Department of Justice concerning the District's compliance with Title VI of the Civil Rights Act . . , and the issues raised in the October 31, 1996 letter from the United States Department of Justice to the District.

(Paragraph 5, emphasis added).

The 1997 Agreement reiterated:

> The pending *Sinajini* case was limited to a determination of the District's compliance with the provisions of the [1975 Agreement].

(Paragraph 4).

The District again denied "any violation of any state or federal law or any wrongdoing as alleged above," and the parties acknowledged "there has been no judicial determination as to the validity of the claims and defenses raised by the parties." (Paragraph 5.)

The plaintiffs voluntarily dismissed their claims in *Chee* and agreed to "stay any further enforcement proceedings" in *Sina-jini* while the parties attempted to resolve their disputes. (Paragraph 10.) The plaintiffs. also dismissed their claims against the State Board and its original members, on condition that the State Board and State Superintendent of Public Instruction act as "Amicus Curiæ to the 1997 Agreement." (Paragraph 11.)

The District agreed *inter alia:* (1) to hold a bond election and use some portion of any proceeds to add classroom and library facilities at two high schools in the southern part of the district; (2) to provide appropriate bilingual education; (3) to continue to incorporate a cultural awareness component into its curriculum; (4) to provide a special education program as required by state and federal statutes and regulations, and (5) to administer a curriculum consistent with applicable statutes and regulations. (Paragraphs 12, 17, 23, 24, 28.)

The parties created a Dispute Resolution Team and procedures to follow before taking any court action concerning issues covered by the 1997 Agreement. (Paragraphs 32–34.)

The parties specifically reserved the question of costs and attorney fees.[4]

### II. Scope of the motions

The plaintiffs seek costs and attorney fees in three matters which were subjects of the 1997 Agreement: (1) *Sinajini;* (2) *Chee;* and (3) a lawsuit contemplated but not yet filed by the United States. (Plaintiffs' memorandum in support at 3–5; *see* Consent Decree, ¶¶ 5 & 36.)[5]

---

3. Parties to the 1997 Agreement are the District, the State Board, the State Superintendent of Public Instruction, the *Chee* plaintiffs, the *Sinajini* plaintiffs, the Navajo Nation, and the United States. (Paragraph 1.)

 The 1997 Agreement and Consent Decree are published in *Sinajini v. Board of Education,* 964 F.Supp. 319 (D.Utah 1997).

4. Paragraph 36 provides:

 The parties shall negotiate agreements concerning costs and attorneys fees in connection with the *Chee* and *Sinajini* litigation and the pending United States' matters . . . If they are unable to reach an agreement, any party may file and serve an appropriate motion for costs and attorneys fees by July 1, 1997, and the matter shall be submitted to the Court for resolution after appropriate briefing and any further proceedings deemed necessary by the Court. This provision shall not be viewed as any indication that fees are or are not due in this matter.

5. Plaintiffs refer to these matters as "three consolidated cases ." (Plaintiffs' First Verified Supplemental Fee Application at 1–2.) They have never been consolidated by a judge of this district. Judge Sam's approval of the parties' 1997 Agreement is binding in *Sinajini* but may not be recognized in *Chee* or other matters.

As noted above, a motion to consolidate *Chee* with *Sinajini* was denied on May 26, 1995. *Supra*, n. 2. *Chee* was pending before Judge Jenkins at the time of its voluntary dismissal. *See* District's memorandum in opposition at 24 n. 10. Accordingly, the plaintiffs should file any request for costs and attorney fees incurred in *Chee* with the *Chee* case. It is not properly before this court.

### III. Discussion

In their first motion for fees, filed on June 26, 1997, the plaintiffs seek costs and attorney fees incurred up to the date of the 1997 Consent Decree. In their second motion, filed on May 11, 1998, the plaintiffs seek costs and attorney fees subsequently incurred in "monitoring the District's compliance with the [1997] Consent Decree and protecting the interests and benefits bestowed ... by the agreement and decree." (Plaintiffs' First Verified Supplemental Fee Application at 2.)

In other words, the first motion is for fees incurred in enforcing the 1975 Agreement and Decree; the second motion is for fees incurred in monitoring the 1997 Agreement and Decree.

### A. First motion for costs and attorney fees

The District argues that the plaintiffs are not entitled to an award of fees on their first motion for three main reasons: (1) the 1975 Agreement and Consent Decree preclude such an award; (2) the plaintiffs had limited success and failed to prevail in the enforcement proceedings; and (3) the plaintiffs cannot recover for claims contemplated by the United States but never filed. (District's memorandum in opposition at 7–26.) They point out that the plaintiffs did not prevail on the "sole issue before the court"—enforcement of the original consent decree—because that decree was dissolved. *Id.* at 21–23.

The State Board adds that it cannot be held liable for attorney fees because: (1) the 1975 Agreement and Decree contain no terms enforceable against the State; (2) the State Board participated in the enforcement proceedings mostly as amicus

curiæ; and (3) the State Board is immune from damages under the Eleventh Amendment. (Amicus curiæ's memorandum in opposition at 7–19.)

### 1. Whether the 1975 Agreement and Decree preclude an award under § 1988

Section 1988(b), also known as the "Civil Rights Attorney's Fee Awards Act of 1976," provides:

> In any action or proceeding to enforce [enumerated civil rights statutes], the court, in its discretion, may allow the *prevailing party*, other than the United States, a reasonable attorney's fee as part of the costs. . . .

(1996 amendment, emphasis added).

The plaintiffs argue they "were already prevailing parties in 1975" because they had obtained an enforceable consent decree. (Plaintiffs' memorandum in support at 5–6.) The Fee Awards Act was not passed until a year after the parties signed the 1975 Agreement. *See* Pub.L. 94–559. Nevertheless, the plaintiffs maintain the case was "pending" when the Act passed because the court retained jurisdiction for monitoring and enforcement purposes.

The plaintiffs then cite *Commissioner, INS v. Jean*, 496 U.S. 154, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990), for the proposition that "the prevailing party status won by civil rights plaintiffs in sustained institutional reform litigation is a one-time threshold determination that carries forward automatically and thus confers continuing prevailing party status in subsequent post-judgment monitoring and enforcement proceedings." (Letter to court dated February 20, 1998.) They insist "there is no de novo reconsideration of whether plaintiffs 'prevailed' at each separate stage of the proceedings for which they claim entitlement." *Id.* (citing *Jenkins v. Missouri*, 127 F.3d 709 (8th Cir.1997)).

The plaintiffs ignore a critical distinction. No court has yet found them to be a "prevailing party" at any stage of the pro-

ceedings. Obtaining a consent decree, by itself, is not sufficient to confer that status.

■ To "prevail" on a civil rights claim, a plaintiff must not only "obtain an enforceable judgment against the defendant from whom fees are sought ... or comparable relief through a consent decree or settlement," but must show that "actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby,* 506 U.S. 103, 111–112, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992).

■ Even if § 1988(b) could be applied retroactively to services rendered in obtaining a consent decree entered before its effective date, the court declines to determine in 1999 whether the plaintiffs might be considered "prevailing parties" in 1975 when they agreed, "The parties shall pay their own costs and attorney's fees." 1975 Agreement, ¶ 53.

Cases where the plaintiff already had "prevailing party" status in the underlying litigation and then sought an award of costs and fees in supplemental proceedings, are therefore distinguishable. *E.g., Jenkins,* 127 F.3d at 714–20; *Arvinger v. Mayor & City Council of Baltimore,* 31 F.3d 196 (4th Cir.1994).

■ The District points out that a party can waive its statutory entitlement to fees as part of a settlement arrangement. *Evans v. Jeff D.,* 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986); *Chicano Police Officer's Ass'n v. Stover,* 624 F.2d 127, 132–133 (10th Cir.1980). In *Evans,* the waiver of any entitlement under § 1988(b) was limited to "costs and attorney's fees thus far incurred." 475 U.S. at 722 n. 5, 106 S.Ct. 1531, 89 L.Ed.2d 747.

■ Because the fee provision in the 1975 Agreement is not limited, the District argues it precludes an award of costs or fees in the subsequent enforcement action as well. The court disagrees. As explained above, the plaintiffs had no statutory entitlement to waive when the 1975

Agreement was signed. But when the enforcement proceedings were commenced in 1992, the Agreement was not the only basis for a fee award; section 1988(b) had been passed. The parties' contractual fee provision is not a clear and unequivocal waiver of any subsequent statutory entitlement.

Thus, the plaintiffs may be entitled to an award of costs and fees subsequently incurred, if they can show that they prevailed in the enforcement proceedings.

### 2. Whether the plaintiffs prevailed against the District and to what extent

■ "Plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant *issue in litigation* which achieves some of the *benefit the parties sought in bringing suit." Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). *"[L]iability on the merits and responsibility for fees go hand in hand." Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Therefore, "a civil rights plaintiff must obtain at least some relief *on the merits* of his claim." *Farrar,* 506 U.S. at 111, 113 S.Ct. 566 (emphasis added).

"[W]hen there has been no adjudication," the Tenth Circuit applies a two-part "catalyst test":

> The plaintiff must demonstrate that *his lawsuit is linked causally to the relief obtained,* i.e., the suit must be a "substantial factor or a significant catalyst" in prompting the defendants to act or cease their behavior. He must also demonstrate that the defendant's conduct in response to the lawsuit was required by the Constitution or federal law, i.e., *the defendant's actions must be legally* required.

*Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social & Rehab. Servs.,* 31 F.3d 1052, 1053 (10th Cir.1994). *See also Beard v. Teska,* 31 F.3d 942, 951–52 (10th Cir. 1994); *Foremaster v. City of St. George,*

882 F.2d 1485, 1488 (10th Cir.1989), *cert. denied*, 495 U.S. 910, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).

The plaintiffs' enforcement proceedings in this case were commenced with a Verified Motion in Supplemental Proceedings for Order to Show Cause which sought the following relief:

(1) a finding of exceptional circumstances and appointment of a special master to monitor the District;

(2) an order finding the District in contempt;

(3) monetary sanctions;

(4) an independent audit of the District finances;

(5) an order preserving all District records;

(6) an order placing the District in partial receivership;

(7) amending the Agreement to require such changes as implementation of bilingual and affirmative action programs in hiring teachers and staff;

(8) requiring the expenditure of funds to ensure compliance;

(9) imposing "specific accounting methods and practices";

(10) additional monitoring of the Decree, including quarterly reporting to the court and other parties;

(11) eliminating time limits for objection to reports;

(12) eliminating negotiation as a prerequisite to court action;

(13) "dismantling the dual education system";

(14) enjoining improper expenditure of categorical funds;

(15) providing compensatory educational services;

(16) amending the Agreement to require relatively higher expenditures in southern schools;

(17) amending the Agreement to require construction and improvement of elementary facilities in the south;

(18) amending the Agreement to require expansion, renovation, and improvement of secondary schools in the south;

(19) amending the Agreement to require construction of an elementary school at Navajo Mountain;

(20) amending the Agreement to require construction of an elementary school at Monument Valley; and

(21) amending the Agreement to increase reimbursement to parents for transporting their children.

(Verified Motion, ¶¶ 21(b)–35, Ex. E to District's memorandum in opposition).[6]

The plaintiffs did not prevail on a number of the claims asserted in this first Verified Motion. The court struck certain allegations—corresponding to claims (1), (7), (11), (14), (16), and (19)—as outside the scope of an enforcement proceeding. New claims in their Second, Third and Fourth Verified Motions were likewise stricken, and some were reasserted in *Meyers*. Their Fourth and Fifth Verified Motions were denied on the merits. Their sixth and final Verified Motion sought relief similar to claims 2–4, 6, 8–10, 13, 15, 17–18, and 20. (Sixth Verified Motion, ¶¶ 10(a)– (1), file doc. # 196.)[7]

Some of the remaining claims are mentioned in the 1997 Agreement. Other claims are not mentioned at all, including claims (3), (4), (5), (6), (8), (13), (15), (17) and (21).

Thus, fifteen of these claims for relief were either stricken or abandoned. The

---

**6.** The plaintiffs also requested an award of costs and attorney fees.

**7.** The Sixth Verified Motion also sought: (1) an award of costs and attorney fees; (2) retention of jurisdiction by the court to enforce the 1975 Decree and supplemental orders; (3) certification of a plaintiff class that would include future Native American students; and (4) "other relief as the Court deems just and proper." Paragraphs 10(m)–(p).

remaining six claims are discussed in more detail below.

### a. Claim (2): an order finding the District in contempt

The plaintiffs never obtained any order finding the District in contempt. The 1997 Agreement mentions the issue without resolving it:

The 1997 Agreement and corresponding Order and Consent Decree ... are intended to resolve the dispute concerning compliance with the 1975 Agreement ...

The District denies any violation of any state or federal law or any wrongdoing as alleged above.

... Nothing in this Agreement should be construed as an admission or acknowledgment in any way that the District has not complied with the provisions of the 1975 Agreement and the Consent Decree or that the District is not in compliance with existing state or federal law in any regard.

(Paragraphs 5 & 41.)

Therefore, the plaintiffs did not prevail on this claim.

### b. Claim (9): imposition of specific accounting methods and practices

The plaintiffs asked that court to "require specific accounting methods and practices to account for all expenditures required by the Decree." (Verified Motion at 19.) The 1997 Agreement provides:

ACCOUNTING PROCEDURES AND EXPENDITURES

The District and the parties plaintiff shall each designate one individual to work together in a cooperative effort with the District Business Administrator to make the District's financial information and records more understandable to the public. *The District,* through its Board of Education, *shall consider and, in its sole discretion, implement* appropriate policies or procedures, consistent with existing state law and regulations,

pursuant to the *recommendations that result from this effort.*

(Paragraph 27, emphasis added).

The District retained the "sole discretion" to implement or reject "recommendations" about its accounting policies and procedures. Thus, the plaintiffs did not succeed in having any specific accounting methods or practices imposed on the District as a legal requirement. *See Farrar,* 506 U.S. at 111, 113 S.Ct. 566 (plaintiff "prevails" only when relief on merits of his claim "materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff").

### c. Claim (10): additional monitoring including quarterly reporting to the court & other parties

The plaintiffs asked for an order requiring the District to report to the following on a quarterly basis: (1) the court; (2) the plaintiffs; (3) the United States Office of Education's Office for Civil Rights; (4) the United States Department of Justice, Civil Rights Division; and (5) the Utah State Office of Education. (Verified Motion at 19–20.)

█ As to monitoring, the 1997 Agreement provides:

The State, as Amicus Curiæ, agrees to use reasonable efforts according to applicable law to monitor the District's educational efforts in the areas of bilingual education, special education, and curriculum.

(Paragraph 40). This does not require the District to make any additional reports to the court or other parties, nor does it subject the District to any monitoring that is not required by existing state and federal laws.

Because the monitoring relief granted in the 1997 Agreement does not "materially alter the legal relationship between the parties," the plaintiffs did not prevail on this claim.

### d. Claim (12): eliminating negotiation as a prerequisite to court action

Rather than eliminating the need for negotiation, the 1997 Agreement established a detailed Dispute Resolution Process. (Paragraphs 32–34.) Any disagreement between the parties must now be submitted in writing to a Dispute Resolution Team before action can be taken in any court. *Id.*

The plaintiffs did not prevail on this claim.

### e. Claim (20): construction of an elementary school at Monument Valley

Regarding an elementary school at Monument Valley, the 1997 Agreement provides:

> [T]he parties ... shall use their best efforts to obtain funding from Congress and appropriate federal or state agencies for (1) the construction of an elementary school at Monument Valley sufficient in size to accommodate Arizona and Utah students residing in the Monument Valley/Oljato areas ... All parties acknowledge, however, that without substantial financial contributions from the United States, the [Navajo] Nation, or the State of Arizona, ... the ... potential elementary facility at Monument Valley shall be designed to accommodate only the Utah student population.... *Nothing in this Agreement shall be construed as imposing any duly or obligation to construct an elementary school at Monument Valley on the District, the State, the Nation, or the United States, that does not exist under current federal, state, or tribal law....*

(Paragraphs 14 & 16, emphasis added).

■ The District agreed only to seek funds from others for the construction of an elementary school. The 1997 Agreement expressly indicates that it imposes no additional duty on the District to build such a facility.

Again, the plaintiffs did not prevail because the relief they obtained did not materially alter the parties' legal relationship.

### f. Claim (18): expansion, renovation, and improvement of secondary schools in the southern part of the district

The plaintiffs asked the court to amend the 1975 Agreement "to require the District to expand, renovate and improve both secondary schools in the southern portion of the District." (Verified Motion at 22.)

The 1997 Agreement contains some provisions about improvements at these schools. It requires the District to hold a bond election in May 1997. (Paragraph 12.) The District did so, and voters in the district approved the issuance of bonds. In that event, the 1997 Agreement provides:

> If the issuance of bonds is approved in that election, *portions of the proceeds* therefrom *shall be used to add additional permanent classroom facilities at Whitehorse High School: Monument Valley High School shall also be improved by expanding the existing library facilities and adding additional classroom facilities. Nothing in this Agreement shall require the District to use all proceeds* from the May 1997 bond election, if approved, *on projects mentioned herein* or at Navajo Mountain.

(Paragraph 12, emphasis added).

If voters had not approved the issuance of bonds, these building projects would "revert to projects considered from district pay-as-you-go resources" and be "subject to prioritization by the Board and the availability of funds." (Paragraph 13.)

The District concedes that the plaintiffs obtained the relief they sought on this claim because construction on projects in the south is going forward. The District nevertheless argues that plaintiffs did not prevail on this claim for several reasons. First, the District maintains it already planned to do the projects when funds became available for them. However, no evidence was submitted in support of this self-serving contention.

Second, the District argues that the 1997 Agreement did not alter the legal relationship of the parties on this issue, since the "case was settled without any assurance that the projects would be built." (District's memorandum in opposition at 18.) The District says it did not promise to complete the projects, but only to pursue a bond election. However, the District also promised to use an unidentified "portion" (not all) of the proceeds for improvements at Whitehorse and Monument Valley High Schools if the bonds were approved. (Paragraph 12.)

The District points out that it had already agreed to hold the May 1997 bond election in connection with *Meyers*. But while the District had agreed to hold a bond election, it had not agreed to use any portion of the proceeds for improvements at Whitehorse and Monument Valley High Schools, the relief sought here.[8]

Finally, the District argues that to prevail in these enforcement proceedings, the plaintiffs must show that failure to make these improvements at Whitehorse and Monument Valley High Schools, violated the 1975 Agreement. The District admits the 1975 Agreement required construction of the two schools, which was done, but maintains that expansion, renovation, or improvements were not required more than 17 years after their construction.

Again, the court disagrees. Paragraph 17 provides:

> The District shall construct secondary facilities in the Oljato–Monument Valley–Mexican Hat area and in the Montezuma Creek–Aneth–Red Mesa area. The District shall use its best efforts to provide an educational program (consisting of facilities, curriculum and extra curricular activities) at each of the new schools which is of substantially as high quality as the existing secondary programs in the District. *Such facilities*

> *shall accomodate*, [sic] *without overcrowding, all students based upon a reasonable projection of student enrollment.*

(1975 Agreement, Ex. A to Plaintiffs' reply memorandum, emphasis added).

Throughout the litigation, the District has maintained that it has complied with all requirements of the 1975 Agreement and Consent Decree. However, it has never filed a motion to dissolve the Decree, based upon an adequate showing of compliance. Judge Anderson even suggested that the District file such a motion. (Order of November 30, 1993.) Since the Decree remained in force, the District had a continuing obligation to provide "facilities [which] accommodate, without overcrowding, all students." (Paragraph 17.)

Moreover, the claim for improvements at these high schools was never stricken with other allegations found to be beyond the scope of an enforcement proceeding. The court will not dismiss them as irrelevant now that the plaintiffs have obtained relief.

■ Accordingly, the court finds that the plaintiffs did prevail on their claim for expansion, renovation, and improvement of the two secondary schools in the southern part of the District. (*See* ¶ 30 of first Verified Motion & ¶ 10(*l*) of Joint Sixth Verified Motion.)

### g. *Creation of committees of experts*

The court will now address the plaintiffs' argument that they obtained an additional benefit in the 1997 Agreement and Consent Decree, which shows they are prevailing parties. The plaintiffs consider the creation of certain committees as one of their greatest achievements in this litigation:

> the permanent secondary facility at Navajo Mountain to serve grades 9–12." Paragraph 7(a)(1), Ex. G to Plaintiffs' reply memorandum of July 28, 1997.

---

8. The *Meyers* Agreement, dated November 22, 1996, required the District to use its best efforts in "[c]onducting a bond election in May, 1997, and from the bond issue committing such funds as are necessary to construct

The [1997] consent decree requires committees of experts to review district programs, make recommendations, and present plans for changes in District programs and services to Native American students. Substantial progress has been made in regards to the work of the committees.... Plans and/or recommendations have been submitted by the Finance Committee, the Special Education Committee and the Bilingual Committee, with recommendations from the Curriculum committee to be submitted shortly. *The work of the committees has provided a substantial and significant benefit on behalf of the Native American class of students in this case.*

(Plaintiffs' trial brief at 2, emphasis added.)

The District responds that this benefit does not meet the standard enunciated in *Farrar* or the Tenth Circuit's catalyst test:

[T]he Plaintiffs did not obtain "comparable relief" through the Decree, that is, they cannot show that the [D]istrict's obligations set forth in the Decree are required by law in response to the Plaintiffs' lawsuit. Rather than ordering the District to take affirmative action that "materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff," *Farrar*, 506 U.S. at 111–12, 113 S.Ct. 566, the [1997] Decree is nothing more than a statement of the parties' intention to work cooperatively and the process by which such cooperation will take place. Indeed, *while parties are required under the [1997] Decree to work together in various committees, they are not ordered to develop a particular plan or result.* Thus, the committees' work, which Plaintiffs cite as positive proof that they have "prevailed," is not binding on the District. *Paragraph 31(e) of the [1997] Decree specifically provides that the "Board may reject or approve each committee plan or any part thereof" and that "If the Board rejects a committee plan, or any part thereof, the*

*plan shall not be binding on the District."*

(District's trial brief at 4, emphasis added.)

 The court agrees that the "creation of committees" is not a claim or issue on which the plaintiffs' prevailed for purposes of attorney fees. Such relief was never requested in any of the Verified Motions, although it relates to several of the plaintiffs' claims in this case, including "dismantling the dual education system" (13 above), requiring the expenditure of funds to ensure compliance with the decree (8 above), and implementing bilingual programs (7 above). Nor were committees of experts mentioned in the 1975 Agreement and Decree.

In any event, the test is not whether the relief obtained is beneficial to the plaintiffs:

If it has been judicially determined that defendant's conduct, however beneficial it may be to plaintiffs' interests, is not required by law, then defendants must be held to have acted gratuitously and plaintiffs have not prevailed in a legal sense.

*Kansas Health Care*, 31 F.3d at 1055 (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 281 (1st Cir.1978)).

The creation of committees was not a legal requirement in this case and cannot be an indication that the plaintiffs prevailed.

### h. Standards for the partially prevailing plaintiff

 In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court addressed the question "whether a partially prevailing plaintiff may recover an attorney's fee for legal services on unsuccessful claims." 461 U.S. at 426, 103 S.Ct. 1933. The Court held:

Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit

consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Id.* at 440, 103 S.Ct. 1933.[9]

These plaintiffs prevailed on their claim for renovation, expansion and improvement of two secondary school facilities, a significant claim. However, it was only one of approximately 21 claims for relief, so the plaintiffs achieved only limited success in view of the entire litigation. Furthermore, the claims on which the plaintiffs failed to prevail are not so related to the successful claim that they should be compensable as well.

The court therefore holds that the plaintiffs are entitled to award against the District of costs and attorney fees incurred in pursuing claim (18) only.

### 3. Whether the plaintiffs can recover for the United States' contemplated claims

■■■ The plaintiffs say the United States contemplated filing a separate action after the court struck various allegations from its Complaint–in–Intervention, and they planned to intervene in the contemplated lawsuit "to protect the benefits they had received in the *Sinajini* consent decree, to expand those benefits by requesting new relief, and to guard against the danger of inconsistent adjudications." (Plaintiffs' memorandum in support at 14.)

Clearly, the plaintiffs did not prevail on allegations which were stricken from this case as outside the scope of an enforcement action. Nor does an intention to pursue those claims in a separate action make them compensable here.

### 4. Whether the plaintiffs prevailed against the State Board

The State Board contends there are no terms enforceable against the State in the 1975 Agreement or Decree. Indeed, that is the "law of the case."

The State Board was named a defendant in the original complaint filed in 1974, and the "State defendants" are defined in the 1975 Agreement to include the State Board. (Paragraph 1(u).) However, the only other reference to any of the State defendants is in ¶ 21, where it says the District shall pay certain tuition "subject to approval by the Utah State Board of Education."

Accordingly, Judge Winder denied the plaintiffs' only verified motions in supplemental proceedings which were directed against the State Board. (Minute Entry of October 31, 1996.) "[T]here's nothing in that agreement, of any kind, that the State defendants agree to do anything," Judge Winder commented. The 1975 Agreement simply "doesn't cover the State." (Transcript of hearing held on October 31, 1996, at 6 & 11.)[10]

■■■ "[W]here a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant." *Kentucky v. Graham,* 473 U.S. at 165, 105 S.Ct. 3099.

The plaintiffs' allegations against the State Board were all denied on the merits, so they are not entitled to a fee award against the State Board.

### B. Second motion for costs and attorney fees

The plaintiffs already seek an award for monitoring the 1997 Agreement and Consent Decree.

---

**9.** The *Hensley* standard applies not only to fees generated before a judgment but to those accrued in post-judgment proceedings. *Joseph A. v. Department of Human Servs.,* 28 F.3d 1056, 1060 (10th Cir.1994).

**10.** In the 1997 Agreement, the plaintiffs dismissed the State Board as a named defendant in this case, without prejudice, on the condition that it participate in the Agreement as amicus curiae. (Paragraph 11.)

■ · Under Tenth Circuit precedent, fees for postjudgment monitoring of a consent decree are available to the party that prevailed in the underlying litigation upon a showing that "the effort expended was necessary and the fees requested by plaintiffs are reasonable." *Joseph A. v. New Mexico Dept. of Human Servs.,* 28 F.3d 1056, 1060 (10th Cir.1994). However, these plaintiffs had limited success in the underlying litigation. They prevailed on only one of 21 claims for relief.

The claim on which they prevailed sought renovation, expansion, and improvement of two secondary schools in the southern part of the district. It does not appear that the plaintiffs' monitoring activities are in any way related to that claim. *See Ass'n for Retarded Citizens of North Dakota v. Schafer,* 83 F.3d 1008, 1011 (8th Cir.), *cert. denied,* 519 U.S. 993, 117 S.Ct. 482, 136 L.Ed.2d 376 (1996) (plaintiffs must prevail on unrelated claims to be entitled to fee award for post-judgment work).

■ The 1997 Agreement and Consent Decree contemplate that future disputes between the parties be resolved through a Dispute Resolution Process involving a Dispute Resolution Team. (Paragraphs 32–34.) Only when those procedures have been exhausted will the parties take action in any court "concerning any issue which is the subject of this Agreement." (Paragraph 34.) The parties also provided for continuing dialog among committees of experts appointed by the parties and for "continuing cooperation" in implementing the terms of the Agreement. (Paragraphs 31 & 35–38.) The plaintiffs' request that attorneys be compensated for monitoring compliance with the Agreement does not seem reasonable or necessary in these circumstances.

Thus, the plaintiffs are not entitled to fees for monitoring the 1997 Agreement and Consent Decree.

### IV. Order

The plaintiffs' first motion for costs and attorney fees is granted in part and denied in part as provided in this order. The plaintiffs' second motion for costs and attorney fees is denied.

The plaintiffs are directed to submit detailed records of costs and fees they incurred in pursuing and prevailing on claim (18): the claim for renovation, expansion, and improvements to the two secondary high schools in the southern part of the district. All submissions to the court must be supported by affidavit to which the District is directed to respond if there is any opposition. The court will then decide whether a hearing is necessary to determine what award would be reasonable.